## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JOLEEN ANNE HANSON,

                        Plaintiff,                        OPINION AND ORDER

    v.

                                                   17-cv-659-wmc

ANDREW M. SAUL, Commissioner of
Social Security,

                        Defendant.

This is an appeal from an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g). Plaintiff Joleen Hanson challenges the Commissioner's determination that she is not disabled and therefore not entitled to supplemental security income under Title XVI of the Social Security Act. Specifically, Hanson contends that the administrative law judge who denied her claim at the hearing level committed the following errors: (1) failed to give adequate weight to the opinion of one her treating physicians, Dr. Popp; (2) failed to consider the side effects of Hanson's medication on her ability to work; (3) failed to discuss Hanson's limited daily activities; and (4) incorrectly accepted the VE's opinion that Hanson could make a vocational adjustment to jobs in the national economy. As discussed below, the first three challenges are unpersuasive and the fourth is waived. Accordingly, this court will affirm the decision of the Commissioner.

## A. Overview of Claimant

Hanson was born on July 4, 1974. She applied for supplemental security income on October 23, 2013, alleging that she had been disabled since June 15, 2013. This made Hanson: 38 years old on the alleged onset of her disability in 2013; 39 years old when she applied for disability later that year; and 42 years old at the time of her second administrative hearing in August 2016.

Hanson has a high school education, and obtained a two-year culinary arts degree. She is able to communicate in English, and has past work experience as a cashier and personal care attendant. She last worked in June 2013. In her initial application, Hanson claimed disability based on Lyme disease, residual limitations from right hand and shoulder surgeries, speech impairment, neuropathy, chronic joint pain, irregular heartbeat, blurred vision on the right, and headaches. (AR 261.)

## B. Overview of Medical Evidence[2]

Hanson's medical records document a variety of physical impairments. In June 2013, she underwent right rotator cuff repair and right carpal tunnel release surgery, with positive results. By October of that year, her orthopedic surgeon, Dr. Thomas Kaiser, indicated that she could return to work lifting a maximum of 20 pounds. Although Hanson

---

[1] These facts are drawn from the Administrative Record ("AR") (dkt. # 8).

[2] Plaintiff has not advanced any arguments related to the ALJ's assessment of her mental impairments. Accordingly, the court discusses only the evidence relating to her physical impairments.

was concerned that she reinjured the shoulder in March 2014, an x-ray showed only minimal abnormalities and Dr. Kaiser did not see any evidence of re-injury. However, he did order an MRI of her cervical spine, which showed mild central canal and neural foraminal narrowing at the C4-C5 level and moderate to severe neural foraminal narrowing at the C5-C6 level.

Hanson's records also show periodic complaints of left ankle and knee pain, and lower extremity pain and weakness. However, x-rays of the ankle and knee were largely normal, and an MRI of the lumbar spine in July 2014 showed no significant pathology. At a visit with Hanson on July 7, 2014, neurologist Christopher Bixler, M.D., encouraged Hanson to "remain active." (AR 1509.) In October 2014, a rheumatologist diagnosed Hanson with fibromyalgia after finding her to be tender in 18 of 18 of the fibromyalgia trigger points, but the doctor did not prescribe any treatment other than medication management by her primary physician. On September 25, 2014, Hanson's primary care physician, Dr. Jeffrey Eichten, opined that Hanson's intermittent lumbar back pain was secondary to weak core muscles, obesity, and fibromyalgia.

On April 10, 2014, Hanson began seeing Dr. Megan Popp, a physical medicine and rehabilitation specialist, for complaints of a "pins and needles" sensation in all four extremities and the lower half of her face, along with muscle tenderness, particularly in her neck area. (AR 652.) Hanson also complained of generalized weakness, stating that she had trouble opening and closing car doors, opening caps, and writing. The physical examination was largely unremarkable, with Hanson demonstrating normal reflexes, fine motor coordination, range of motion and strength. Dr. Popp observed that Hanson's gait

was steady.  Dr. Popp later referred Hanson to physical therapy, which Hanson attended for 11 sessions.  However, Hanson stopped attending therapy before discharge.  (AR 580.)

At a follow-up with Dr. Popp on July 1, 2014, Hanson reported that her symptoms were overall improved as a result of some medication changes and that she had lost 11 pounds by dieting.  She said she was doing her physical therapy exercises at home but was not finding it very helpful; according to Hanson, she felt like her legs would give out on her.  On physical examination, Hanson was able to sit comfortably, rise independently from the chair, and had a steady gait.  Hanson asked about a four-wheeled walker, stating that a friend would go for her with walks outside but Hanson did not feel stable enough to walk unsupported.  Dr. Popp issued one even though she was hesitant to do so, advising Hanson that she should not be using it all times and should rely on it less and less as she became stronger.  (AR 637-38.)

Meanwhile, Hanson had begun working with a dietician to lose weight in advance of planned gastric bypass surgery.  On October 8, 2014, she reported that she was keeping a food journal and had been walking daily for 15-20 minutes.  (AR 815).  On December 10, 2014, she told her dietician that she was "outside everyday" doing farm chores, cutting trees, stacking wood, and shoveling for "hours."  (AR 976.)

Less than a month later, on January 6, 2015, Hanson saw Dr. Popp and asked her to complete paperwork outlining her work restrictions.  Dr. Popp went through the form with Hanson and completed it based on Hanson's statements and Dr. Popp's physical examination.  Hanson said her primary complaint was lower back pain radiating into her lower extremities, but she had multiple other painful areas and intermittent numbness in

both hands. Hanson said she had to change positions frequently to stay comfortable, could tolerate being on her feet no more than 5 hours a day, could sit no more than 6 hours a day, and could lift no more than a gallon of milk. Dr. Popp's notes from her physical examination did not note any abnormalities, but noted that Hanson arrived using a manual wheelchair. (AR 963-64.)

On March 17, 2015, Dr. Kaiser, an orthopedist, saw Hanson for complaints of right wrist pain that she said resulted from a fall on the ice in December 2014. (AR 913.) An MRI on April 23, 2014, showed Hanson had some torn tendons and cartilage in the wrist, and an EMG showed residual carpal tunnel syndrome in the right wrist, with moderate carpal tunnel on the left. (AR 1055.) Dr. Kaiser, who was soon to retire, referred Hanson to Dr. Kuzel, who injected the right wrist with a steroid on August 16, 2015.

Hanson saw Dr. Kaiser in follow up on September 25, 2015. She reported that after the steroid injection, her pain increased and her fingers swelled up to the point where she could not move them. Although Dr. Kaiser did not see much swelling, Hanson held her hand in a guarded position and did not use it much. Dr. Kaiser had Hanson do some exercises with her hand and fingers and by the end of the appointment, her motion had improved. He showed Hanson exercises that he wanted her to do at home, and set her up for "aggressive rehab to regain function in the hand." (AR 1306.)

Hanson had a follow-up visit with Dr. Kaiser on October 9, 2015. (AR 1485-86.) Hanson reported working hard on the hand exercises that Dr. Kaiser had shown her and her symptoms had greatly improved. Hanson still reported some tingling in the fingers in her right hand and some ulnar joint pain, but overall her motion and function was much

better. She was able to fully extend and spread all of her fingers on the right, make a fist, and oppose her thumb to the base of the little finger. Dr. Kaiser opined that Hanson had mild carpal tunnel syndrome in the right wrist and moderate on the left, and that her right wrist pain was related to a cartilage tear. Her recommended that she continue rehabbing the right hand, wrist and elbow, and work with Dr. Popp on range of motion and strengthening.

Hanson saw her family practitioner, Dr. Eichten, on November 12, 2015. Hanson had a large disability form that she asked Dr. Eichten to fill out, explaining that she was applying for disability because of psychiatric disorders. Hanson said she could not work because of panic attacks. Dr. Eichten did not have enough information about her psychiatric condition to provide an opinion about her ability to work. However, he said he thought Hanson could work and he encouraged her not to apply for disability. (AR 1431.) He also ordered an occupational therapy assessment to determine what she could do physically, noting that her physical limitations seemed "a bit vague, likely mostly related to her psychiatric issues." (AR 1432.)

Hanson saw Dr. Popp on December 1, 2015. (AR 1423-24.) Hanson was wearing a wrist brace all the time and had not been using her hand at all, reporting that it hurt just to touch it or move it even a little. Dr. Popp noted that Dr. Kaiser had recommended ongoing rehab, but Hanson had not been participating in any outpatient occupational therapy. Hanson was scheduled to see Dr. Hoxie, a hand specialist, later that month. Hanson asked Dr. Popp to complete paperwork regarding her workability status, and to update it to address the progressive symptoms of her right wrist and hand.

Dr. Popp noted that Hanson's right hand and fingers were cooler and a bit duskier compared to the left. Hanson could wiggle her fingers a little, but reported increased sensitivity. Dr. Popp opined that Hanson was developing a complex pain syndrome in the right wrist and hand. She wrote that if Dr. Hoxie did not find any underlying structural or vascular dysfunction, then Hanson should receive more aggressive rehab programming likely with occupational therapy and possibly an injection block to get Hanson's symptoms to calm down. Dr. Popp updated Hanson's paperwork to reflect her "current level of functioning." Dr. Popp found that Hanson could: (1) lift and carry up to 10 pounds occasionally and 5 pounds frequently with her left arm, but could do no activities requiring use of the right arm, hand or fingers; (2) stand and walk no more than 5 hours a day; (3) walk no more than 1 block without pain or needing to rest; (4) rarely twist or bend and never crouch or squat; and (5) sit no more than 5 hours a day. Dr. Popp further opined that Hanson needed a four-wheeled walker and frequent position changes and that her symptoms would cause her to miss work more than twice a month. (AR 784-88). On August 16, 2016, Dr. Popp provided an updated opinion on which she added that Hanson would need to take a 10-minute break every 2 hours as a result of her impairments. (AR 1517.)

For much of the time period covered by the medical records, Hanson was morbidly obese, weighing 292 pounds at a height of 5' 2". However, Hanson had gastric bypass surgery on June 22, 2015. By the time of the hearing, she weighed 154 pounds.

## C. Administrative Proceedings

After two denials, Hanson's application eventually was heard by an administrative

law judge ("ALJ"), who held two hearings at which Hanson was represented by counsel and testified. The ALJ also heard testimony from L. David Russell, a vocational expert.

Hanson testified that she can lift at most three pounds with her left hand and walk at most a few feet. She said she needs to use a walker at all times and cannot stand without it unless she has something else to hold on to. She further testified that she is only able to bend at the waist about 35 degrees; she is right hand dominant and cannot use her right hand to do anything (such as screw on a nut, button a button, or eat); she has difficulty taking care of her own needs such as bathing, getting dressed, and putting on her shoes; and she takes a number of medications that cause side effects, including dizziness, stomach irritation, tiredness, foggy memory, and confusion. Hanson testified that, because of the pills she takes, she must lie down every two hours for one hour. (AR 58-74.)

On August 31, 2016, the ALJ issued a decision finding Hanson not disabled under the agency's five-step procedure for evaluating disability claims. 20 C.F.R. § 416.920. The ALJ found that, although Hanson suffered from various impairments that reduced her capacity for work, she nonetheless was able to perform a number of jobs existing in the national economy, namely, school bus monitor and security systems monitor. As a predicate to this conclusion, the ALJ considered Hanson's statements concerning her limitations, the medical evidence, and the various medical source opinions, determining that Hanson had the residual functional capacity to perform light work (lifting and carrying 10 pounds frequently and 20 pounds occasionally, with the ability to stand or walk about six hours in an 8-hour day), with the following restrictions:

- she could use her right upper extremity only for occasional handling and fingering;

8

- she could not be exposed to dusts, fumes, gases, or other environmental pollutants;

- she was limited to simple instructions; and

- she could not perform high stress work, such as "working on an assembly line with fast pace and high production goals" or quotas.

(AR 20.) The ALJ gave great weight to the opinions of the State agency medical consultants, who reviewed Hanson's claim at the initial and reconsideration levels and found that she could perform light work so long as she did no more than occasional handling and fingering on the right due to right upper extremity weakness. (AR 27.) The ALJ explained that the consultants had specialized knowledge in evaluating impairments under the Social Security regulations and their opinions were generally consistent with the evidence in the record at the hearing level. (*Id*.)

In contrast, the ALJ found that Dr. Popp's more restrictive opinion was entitled to little weight for the following reasons:

- Hanson had not pursued proper treatment for her right hand and wrist impairment, but simply opted not to use it;

- the severe lifting restrictions endorsed by Dr. Popp were inconsistent with Hanson's report to her dietician in December 2014 that she was "outside everyday" doing farm chores, cutting trees, stacking wood, and shoveling for "hours";

- Hanson had worked as a cashier during the time period she received treated from Dr. Popp;

- post-operative x-rays of Hanson's right shoulder in March 2014 showed only minor abnormalities;

- the standing and walking limitations endorsed by Dr.

Popp were inconsistent with the dietician's October 2014 note indicating that Hanson was exercising daily by walking for 15-20 minutes;

- Hanson's strength and sensation were noted to be normal on numerous examinations; and

- Dr. Popp's opinion was undermined by her failure to refer Hanson for more aggressive treatment.

(AR 29.)

The ALJ rejected Hanson's subjective complaints largely for these same reasons, finding that "[o]n the whole, the claimant's allegations regarding her limitations resulting from her physical impairments have been more extreme when compared to the objective evidence [sic] mild physical impairments and wholly conservative course of treatment." (AR 25.) With respect to Hanson's alleged medication side effects, the ALJ found them unsupported by the treatment notes, which showed that no medications were discontinued or substituted because of reported side effects; to the contrary, Hanson reported that her psychotropic medications, at least, were helpful when she took them. (AR 27.) The ALJ also found that Hanson's daily activities were inconsistent with the severe level of disability she alleged. (AR 27.) Specifically, the ALJ pointed to a number of Hanson's earlier statements about her activities that indicated greater functional abilities than suggested by her hearing testimony, namely: (1) her report in March 2014 that she had to lift a bunch of boxes while moving to a new residence; (2) her report to her dietician in October 2014 that she was exercising daily by walking 15-20 minutes; (3) her report in December 2014 that she was outside every day doing farm chores such as cutting trees, stacking wood, and shoveling for "hours;" (4) her Adult Function Report, which indicated that she helped her

children with homework and cooked them meals, cared for a dog and a lizard, folded clothes and put away dishes, went out three times a week for appointments and grocery shopping, attended church and group therapy, sewed, watched movies, played with her dog, played cards, and used the computer; and (5) her ability to work as a cashier for at least a brief period after her alleged onset date. These activities, found the ALJ, were inconsistent with a total inability to work but consistent with a residual functional capacity for "light" work with additional postural limitations on use of the right extremity.

Having determined Hanson's residual functional capacity, the ALJ proceeded to determine whether Hanson could perform her past work or other jobs in the national economy. At the administrative hearing, the vocational expert had testified that a person with Hanson's age, education, work experience, and residual functional capacity would be unable to perform Hanson's past relevant work as a cashier and personal care attendant because both jobs required frequent handling and reaching, but could perform the job of security systems monitor, of which there were 113,000 jobs in the national economy. (AR 78.)[3] He further testified that his opinion was consistent with the job descriptions set forth in the *Dictionary of Occupational Titles*, and that he had relied on information supplied by the Bureau of Labor Statistics for his estimates of the number of such jobs existing in the national economy. (AR 78, 81.)

The VE explained that the job of security monitor was a sedentary job that would require infrequent hand use to perform tasks such as dialing a phone or using a radio to

---

[3] Later, in response to special interrogatories posed by the ALJ, the vocational expert added the job of school bus monitor, and modified his job numbers estimates. (AR 347-51.)

communicate. (AR 78.) Further, because it was stationary, it could be performed by someone who had to use a walker to ambulate or balance. (AR 80-81.) In response to a hypothetical posed by Hanson's counsel, the VE testified that a person capable of only left-handed work still could work as a security monitor. (*Id*.)

Relying on the VE's testimony, the ALJ found that Hanson was unable to perform her past relevant work but could perform a significant number of jobs existing in the national economy, namely, security systems monitor and school bus monitor.

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Plaintiff asserts that the ALJ committed the following errors: (1) failed to give adequate weight to Dr. Popp's opinion; (2) failed to consider the side effects of plaintiff's medication on her ability to work; (3) failed to properly consider plaintiff's limited daily

activities; and (4) incorrectly accepted the VE's opinion that plaintiff could make a vocational adjustment to jobs in the national economy.[4]

## I.  Dr. Popp's Opinion

At the outset, the court notes that although plaintiff seeks a remand for what she contends was the ALJ's faulty assessment of Dr. Popp's opinion, plaintiff never explains why Dr. Popp's opinion matters to her disability claim. Although Dr. Popp opined that plaintiff had numerous physical restrictions, the vocational expert testified that many of those -- including limited use of her hands and need to use a walker -- were not work-preclusive.  Thus, it is not self-evident that the ALJ's decision to give little weight to Dr. Popp's opinion was material to the outcome of her SSI application.  A plaintiff must make at least *some* showing that a remand for reconsideration of a specific piece of evidence could affect the outcome of her case.  *Accord Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (declining to remand for consideration of plaintiff's obesity, in part because plaintiff "does not specify how his obesity further impaired his ability to work"); *Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).

Nevertheless, defendant does not argue harmless error, and it seems plain that if the ALJ were to have credited Dr. Popp's opinion that plaintiff would miss more than two days

---

[4] Plaintiff also asserted that she could not find support in the medical record for one of the ALJ's findings concerning her alleged speech deficit.  (Pl.'s Br. (dkt. # 10) 62.)  After defendant identified the supporting evidence, plaintiff did not pursue the issue further, apparently abandoning the argument.

of work every month, then he would have found plaintiff disabled. Accordingly, the court will address plaintiff's arguments concerning Dr. Popp, even though many of the limitations she found are immaterial.

Under the applicable regulation, a treating physician's opinion is entitled to "controlling weight" if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 416.927 ("Evaluating opinion evidence for claims filed before March 27, 2017."). If the opinion does not meet the test for controlling weight, the ALJ must decide what weight it does deserve, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. *Campbell*, 627 F.3d at 306. The regulation provides that the ALJ must always give "good reasons" for the weight afforded a treating source report. 20 C.F.R. § 416.927(c)(2).

The Seventh Circuit has nevertheless recognized that, while a treating physician's opinion is important, it is not the final word on a claimant's disability. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ may discount a treating physician's medical opinion if it is internally inconsistent, conflicts with the provider's own treatment notes, or is inconsistent with the opinion of a consulting physician, *see, e.g., Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *Henke v. Astrue*, 498 Fed. Appx. 636, 640 (7th Cir. 2012); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), so long as he minimally articulates his rationale, *see Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Schmidt*, 496 F.3d at

842; *see also Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted).

The ALJ satisfied that standard here. As summarized above, the ALJ noted numerous inconsistencies between the limitations set forth in Dr. Popp's report and the evidence of record, such as plaintiff's work as a cashier during the time frame she was treated by Dr. Popp; her statements to other providers that indicated that her restrictions were far less severe than Dr. Popp found; the relatively minor abnormal findings on physical examinations; and Dr. Popp's failure to refer plaintiff for more aggressive treatment. Dr. Popp's opinion was also contradicted by the state agency physicians, who found that plaintiff had less restrictive limitations.

Plaintiff does not dispute that the ALJ articulated his rationale, but she disagrees with some of his reasoning. First, she argues that in finding that plaintiff's "course of treatment was not aggressive enough to treat the right hand and wrist impairment," the ALJ overstepped his bounds and "played doctor." *See, e.g., Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009) ("The inference that [insulin] was not prescribed because Myles was not experiencing significant problems appears to be the ALJ's own inference, and is wholly unsupported by the record."). Although it is true that ALJs must be careful not to rely on their own lay opinions to draw medical conclusions, the ALJ did not do that here. At the time Dr. Popp provided her December 1, 2015, opinion restricting plaintiff from all activity with her right hand, neither she nor any other doctor had suggested that plaintiff's hand and wrist symptoms were permanent. To the contrary, both Dr. Kaiser and Dr. Popp

were of the view that plaintiff could regain function in the right hand with aggressive rehabilitation. As the ALJ pointed out, plaintiff had not yet engaged in such rehabilitation when Dr. Popp provided her restrictive opinion, and in fact, was not using her right hand at all, even though Dr. Kaiser had encouraged her to do so.

SSR 16-3p directs ALJs to consider an individual's treatment when evaluating the intensity, persistence, and limiting effects of her symptoms. Here, the ALJ reasonably concluded that plaintiff's lack of aggressive treatment for her right hand was inconsistent with her reported inability to use it and Dr. Popp's apparent acceptance of that report. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (affirming adverse credibility finding based on "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session"); *cf. Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) ("More significantly, the epidural steroid injections were the most invasive treatment [the claimant] received for her back pain, and those injections have been characterized as 'conservative treatment.'") (citing *Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir. 2000)). Plaintiff argues that the ALJ gave short shrift to the fact that she had previous surgery on her right hand and wrist and right shoulder, but the ALJ discussed this evidence, noting that those surgeries were largely successful. (AR 22.) With respect to the hand and wrist problems that began after plaintiff fell in early 2015, however, the ALJ reasonably relied on the absence of aggressive treatment for those problems to discount the severity of those complaints.

Plaintiff next criticizes the ALJ for relying on the dietician's note stating that plaintiff was "outside everyday with farm chores, cutting trees, stacking wood and

shoveling for hours" as a reason to give little weight to the extreme lifting limitations endorsed by Dr. Popp. Plaintiff first "question[s] [the note's] accuracy," pointing out that plaintiff testified at the hearing that all she could do on her farm was pet the cattle. (Br. in Supp. (dkt. # 10) 48.) As the Commissioner points out, however, the ALJ was not required to credit plaintiff's testimony at the hearing over her contemporaneous statement made in the course of medical treatment. Second, plaintiff argues that Dr. Popp was plaintiff's treating physician for many years. Although plaintiff's point is unclear, the court understands her to be arguing that Dr. Popp's ability to observe plaintiff on numerous occasions should have been given more weight than a single contradictory statement in the record. However, such an argument invites the court to reweigh the evidence, which it cannot do. Because reasonable people could infer from the dietician's note that plaintiff was not as restricted as Dr. Popp found, this court must uphold the ALJ.

Next, plaintiff argues that, contrary to the ALJ's finding, there is nothing inconsistent between Dr. Popp's opinion that plaintiff could walk no more than 1 block without rest or severe pain and the dietician's note indicating that plaintiff was exercising by walking daily for 15-20 minutes. Plaintiff argues that because she walks at a very slow pace with a walker and rests frequently, it takes her 15 minutes to walk one block. Such evidence does not appear in the record, however, and the ALJ reasonably inferred from plaintiff's pre-surgery weight loss that she was walking more than 1 block in 15-20 minutes. In any case, as noted previously, the vocational expert testified that the security monitor job did not require walking, so any error on this point is harmless.

In a similar vein, plaintiff argues that the ALJ inferred too much from the fact that

plaintiff worked as a cashier in late 2015 when he noted that fact as a reason to discount Dr. Popp's opinion. Plaintiff points to a note in the record from her employer stating that she worked only 135 hours between August 6 and September 28, 2015, and that she was let go because she was missing too much work. (AR 345.) Plaintiff argues that "[t]he fact of Hanson not being able to physically do her job" supports Dr. Popp's limitations. (Br. in Supp. (dkt. # 10) 49.) However, the note does not say that plaintiff could not "physically do her job," only that she was missing too much work. In any case, even if this court discounts this particular finding by the ALJ, he provided sufficient other "good reasons" to discount Dr. Popp's opinion. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (upholding ALJ's credibility finding even where two of three of claimant's criticisms were valid).

Finally, plaintiff argues that Dr. Popp's opinion should have been given more weight because it was consistent with findings made by Dr. Hasan, a consultative examiner who examined plaintiff on December 28, 2013. As plaintiff points out, like Dr. Popp, Dr. Hasan found that plaintiff needed a walker for short and long distances and uneven terrain; could not bend, stoop, crouch, or squat; and could only occasionally perform handling and fingering with the right side. In mid-October 2013, plaintiff was treated for a suspected ankle fracture after twisting her foot suddenly. She was prescribed a Cam boot and a walker, which she was using at the time of her evaluation with Dr. Hasan. (AR 608.) Dr. Hasan noted that his restrictions on walking, standing, bending and stooping were to address plaintiff's left ankle fracture and weakness. (AR 522-23.) However, an x-ray of plaintiff's ankle a month after her visit with Dr. Hasan showed no fracture or dislocation.

(AR 531.)

The ALJ accepted Dr. Hasan's limitation of only occasional handling and fingering, but rejected the walker limitation and the restrictions on bending, stooping, crouching, and squatting. The ALJ explained that he rejected these limitations largely for the same reasons he rejected Dr. Popp's similar conclusions: (1) the MRIs and x-rays had found only mild abnormalities; (2) plaintiff was noted during numerous exams to rise from a seated position without assistance and walk steadily; (3) Dr. Popp initially encouraged plaintiff *not* to use a walker; and (4) in 2014, plaintiff was able to work outside doing physical chores on the farm and walk for 15-20 minutes every day. (AR 28.)

Contrary to plaintiff's unsupported argument, the ALJ was well within his discretion to rely on these inconsistences to reject *both* Dr. Hasan's and Dr. Popp's conclusions in favor of those of the state agency physicians. *See* 20 C.F.R. § 416.927 (providing that ALJ will consider supportability of opinion and consistency with record as a whole in weighing medical opinions).[5] As the ALJ explained, the opinions of the state agency physicians were more consistent with the record *as a whole*, including the objective medical evidence, plaintiff's reported activities, and course of treatment. The ALJ was not obliged to turn a blind eye to this evidence and accept Dr. Popp's restrictions simply because Dr. Hasan had found similar restrictions.

---

[5] In reply, plaintiff argues perfunctorily -- and for the first time -- that the ALJ should have rejected the state agency physicians' opinions on the ground that they were "stale." Because plaintiff did not raise this issue in her opening brief, she has waived it. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005) (holding that failure to develop an argument until the filing of a reply brief constitutes waiver).

In sum, the ALJ provided sound reasons, supported by substantial evidence in the record, for discounting Dr. Popp's opinion. Accordingly, this court finds no error in regard to the ALJ's treatment of Dr. Popp's opinion.

## II. Medication Side Effects

Plaintiff argues the ALJ erred by "failing to address" her medication side effects. Although plaintiff fails to specify what particular side effect prevents her from performing the jobs identified by the ALJ, the court assumes she is referring to her testimony that her medicine makes her so tired that she needs a one-hour nap every two hours. As the VE testified, such a limitation would preclude all competitive work.

Contrary to plaintiff's argument, the ALJ did not ignore this testimony. Instead, he explicitly rejected it, explaining that nothing in the treatment notes showed that plaintiff complained of such side effects to her doctors. (AR 21, 27.) Plaintiff raises no objection to this reasoning, so she has waived it. *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (arguments that are not raised or developed are considered waived). Nevertheless, any such challenge would fail. It was not unreasonable for the ALJ to infer that, if plaintiff's medication indeed caused such extreme fatigue, she would have said something to her doctors about it.

## III. Daily Activities

In determining plaintiff's residual functional capacity, the ALJ considered plaintiff's activities of daily living and determined that they were inconsistent with her allegations of disability. (AR 27.) Plaintiff argues that in so finding, the ALJ "glossed over" her hearing

testimony where she described numerous restrictions on her daily activities, including an inability to read and write, use her right hand for fine fingering, reach overhead with her right arm, walk without a walker, or bend more than 35 degrees at the waist.

This argument is unpersuasive. The ALJ recited these allegations in his decision, but explained that, to the extent plaintiff was alleging a total inability to work, her allegations were inconsistent with the record as a whole. (AR 21.) As detailed above, the ALJ cited plaintiff's own contradictory statements about her activities that indicated that she had greater functional abilities than she testified at the hearing. Given this contradictory evidence, it was up to the ALJ to decide which evidence to credit and which to reject, and plaintiff offers no specific challenge to any of the ALJ's findings. Accordingly, this court will not disturb the ALJ's conclusion with respect to plaintiff's daily activities.

## IV.    VE Testimony

Finally, plaintiff purports to challenge the ALJ's decision on the ground that "the ALJ incorrectly accepted the opinion of the VE in finding Hanson could find a job in the national economy." (Pl.'s Br. (dkt. # 10) 56.) However, plaintiff fails to develop any argument as to why the ALJ erred. For the most part, her "argument" consists of cut-and-pasted portions of the VE testimony from the hearing transcript. Plaintiff refers to the opinion letter by David Traver and attaches a copy to her brief, but she does not offer any critique of the ALJ's analysis of that opinion, nor does she explain what this court ought to do with it. (*Id*. 56-58.) In light of this utter lack of development, plaintiff has waived her challenge to the ALJ's Step Five determination. *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are

unsupported by pertinent authority, are waived[.]"); *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) ("This court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel.") (internal quotations and citations omitted).

ORDER

IT IS ORDERED that the decision of the Commissioner of Social Security denying plaintiff Joleen Hanson's application for Supplemental Security Income is AFFIRMED. The clerk of court is directed to enter judgment for the defendant and close this case.

Entered this 25th day of September, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge